NOT DESIGNATED FOR PUBLICATION

No. 114,494

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BRENDA J. LUNDEEN,
*Appellee/Cross-appellant*,

v.

MICHELLE M. LENTELL, M.D.,
*Appellant/Cross-appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed June 30, 2017. Affirmed.

*Bruce Keplinger, John Hicks,* and *Samuel P. Bennett*, of Norris & Keplinger, L.L.C., of Overland Park, for appellant/cross-appellee.

*Michael L. Hodges*, of Hodges Law Firm Chartered, of Lenexa, and *Patrick A. Hamilton*, of Hamilton Law Firm LLC, of Lenexa, for appellee/cross-appellant.

Before ARNOLD-BURGER, C.J., GREEN and MCANANY, JJ.

*Per Curiam*: Michelle Lentell, M.D., appeals the adverse judgment in a medical malpractice action brought against her by Brenda Lundeen, whose uterus was perforated during an endometrial ablation procedure. The perforation caused heated thermal ablation fluid to spill into Lundeen's abdominal cavity, severely injuring her bowel. Dr. Lentell's appeal centers on the admission of testimony from Lundeen's expert witness and various jury instructions. Lundeen cross-appeals on the issue of the constitutionality of our statutory $250,000 cap on noneconomic damages.

1

The events leading to this lawsuit began when Lundeen met with Dr. Lentell, an obstetrician/gynecologist, for symptoms of heavy menstrual bleeding, known as menorrhagia. Dr. Lentell recommended that Lundeen undergo an ablation procedure, which would destroy the endometrium and alleviate her menorrhagia symptoms.

*The Procedure*

Dr. Lentell chose to use a technique known as hydrothermal ablation (HTA), which uses a medical device designed and manufactured by Boston Scientific Corporation. During an HTA procedure, fluid is heated to 194° F and circulated through the patient's uterus. The HTA uses a closed-loop system with two plastic tubes to continuously circulate the fluid throughout the uterus under direct hysteroscopic guidance. The HTA's heated fluids come into direct contact with the lining of the uterus, ablate it, and are returned to the HTA to be circulated again for a period of 10 minutes.

On December 16, 2010, Lentell performed the HTA procedure on Lundeen at the Mid America Surgery Institute, LLC (Mid America), an out-patient surgery center located on the campus of Menorah Medical Center. Prior to the procedure, Dr. Lentell performed a dilation and curettage (D&C) and used a curette, a sharp instrument, to scrape tissue from Lundeen's uterine lining. She sent the tissue to pathology to rule out uterine cancer as a cause of her bleeding. The HTA procedure is contraindicated for use in a patient who has cancer.

After performing the D&C, Dr. Lentell placed a hysteroscope into the uterine cavity and performed a test to ensure that the system was closed and there would be no leaking of heated fluid. This cavity assessment showed there was no perforation of the uterus.

2

Finding no perforation, Dr. Lentell began the procedure, which involved heating and circulating saline through the uterine cavity. The saline is gravity fed from a plastic bag hanging on an IV pole into the HTA for heating and comes out through a clear plastic tube attached to the physician's hysteroscope inside the uterus. The fluid is drawn back into the HTA for recirculating through another clear plastic tube which is also attached to the physician's hysteroscope.

During the 10-minute treatment cycle, the gynecologist (1) tells the circulating nurse when to turn on the HTA device, (2) holds the hysteroscope in place in order to maintain the seal on the patient's cervix and prevent hot fluid from escaping into the vagina, and (3) monitors the inside of the uterus on a video screen. Dr. Lentell was taught how to use the HTA machine by Boston Scientific sales representative Diane Fowler.

The HTA machine had a safety device mechanism to automatically shut off the machine if it sensed a loss of 10 cc of fluid. A loud alarm sounds when it shuts off. About 9 minutes and 20 seconds into Lundeen's 10-minute procedure, the HTA machine automatically shut itself off. Dr. Lentell checked to make sure there was no leakage of fluid from the tubes, no kinking of the tubes, no leakage of fluids inside the vagina, and no evidence that there was a drop in the amount of fluid in the canister.

Dr. Lentell instructed the nurse to turn the HTA machine back on, but the machine immediately sounded the alarm and turned itself off again. The training manual instructs that the physician should only turn on the HTA machine "[i]f the physician is certain that there is no perforation, or no internal leak . . . ." Dr. Lentell did not inspect the uterus for a perforation until after she turned the machine on again a second time.

Dr. Lentell then used a hysteroscope to inspect the uterus. She found a 1-centimeter hole in the fundus of the uterus. She immediately began flushing cool fluids

3

through the uterus to minimize any further injury from hot saline leaking into the abdominal cavity.

Lundeen woke up after the procedure in the fetal position with an "all consuming" abdominal pain, cramps, and a burning sensation. She requested pain medication.

Dr. Lentell immediately contacted Dr. James Davidson, a surgeon, who recommended that Lundeen be transferred to Menorah Medical Center. Lundeen was transferred across the campus to the nearby hospital by ambulance. Dr. Lentell told Lundeen that there had been a complication, and she would grab her coat and meet her at the hospital. Dr. Lentell did not arrive at the hospital until 2 ½ hours later. Shortly after Lundeen's procedure, the HTA machine at Mid America disappeared and was never found thereafter. According to Lundeen, she did not receive any pain medication while waiting at the hospital for Dr. Lentell because the hospital could not get in touch with Dr. Lentell.

Once Lundeen was at the hospital, Dr. Lentell consulted with Dr. Davidson. She told him that hot liquid entered Lundeen's abdominal cavity "through a perforation or a hole in the uterus." After a lengthy discussion with Dr. Lentell, Dr. Davidson decided to wait until the following day to perform a laparotomy in order to evaluate the extent of Lundeen's injury.

Dr. Lentell contacted Fowler of Boston Scientific to see if something like this had ever happened before. Fowler told her that she had never seen or heard of an HTA procedure in which the uterus was perforated during the procedure.

In her post-operative report, Dr. Lentell stated that there was a "[u]terine perforation 9 minutes into hydrothermal ablation procedure," and "[u]p to 1000 cc

4

unaccounted for hydrothermal ablation fluid, 1500 cc cool distention fluid put in the abdomen post hydrothermal ablation intentionally."

Boston Scientific interviewed Dr. Lentell about the incident, and she told the company that Lundeen's uterus perforated during the procedure, but she did not know how. Dr. Lentell never used an HTA device after Lundeen's procedure.

*Lundeen's injuries*

In the laparotomy the day after Lundeen's HTA procedure, Dr. Davidson could see a small perforation in the uterus which had almost sealed. The ileum—which is the end of the small intestine that connects to the colon—showed "pretty significant" burns and areas of the bowel needed to be resected or repaired. Dr. Davidson then opened Lundeen's abdomen through a bigger incision and did a complete exploration. He removed 21 inches of Lundeen's intestines. He observed other parts of Lundeen's bowel that also were burned, but he chose to leave them in hopes the burns ultimately would heal. Lundeen spent 5 days in the hospital before she was discharged.

The day after she was discharged, Lundeen's abdominal pain increased and she had a fever. Dr. Davidson advised Lundeen to go immediately to the hospital emergency department. Because of his concern that fluid was leaking from Lundeen's bowel, he performed another surgery. In the second surgery, on December 24, 2010, Dr. Davidson removed additional portions of Lundeen's intestines and diverted her colon to an external colostomy bag in order to give Lundeen's intestines time to heal. This temporary colostomy remained in place until November of 2011.

Lundeen was a fifth grade school teacher earning $49,000 a year. She missed 5 months of work after her injury. During the time she was required to use the colostomy

bag, she had no prior warning of a bowel movement. Her colostomy bag would suddenly fill and she would have to replace it. She had no control over intestinal gas, and the connection to the colostomy bag made embarrassing and humiliating "loud noises" and had an "ungodly odor" which caused her students to giggle and laugh. Her colostomy bag leaked 9 or 10 times while she was teaching. Each time, she would have to go home, shower, replace the bag, change her clothes, and return to work.

Lundeen had to buy new clothes to accommodate her colostomy bag. She was also required to change her diet and take medication to prevent diarrhea. Her intimate relationship with her husband was affected during the 11 months she wore the colostomy bag, and she did not like to go out in public.

In July 2011, Lundeen went to the Mayo Clinic in Rochester, Minnesota, on the referral of Dr. Davidson, where she was examined and told that she needed to wait longer before the colostomy bag could be removed. She returned to the Mayo Clinic in November 2011, and her intestines were reconnected in a third surgery and the colostomy bag removed. She continued thereafter to take medication to regulate her stools, and she continued to have pelvic pain that required ongoing treatment.

*This Suit*

On November 27, 2012, Lundeen brought suit against Dr. Lentell, Mid America, and Boston Scientific Corporation. Boston Scientific Corporation and Mid America settled with Lundeen before trial.

Lundeen's sole liability expert, Dr. Eric Colton, was deposed in the course of discovery. Dr. Colton, who is board certified in obstetrics and gynecology, specializes in laparoscopic, hysteroscopic, and vaginal reconstructive surgery, as well as office-based

gynecological surgery. He has performed approximately 2,700 diagnostic and operative hysteroscopies and approximately 1,000 endometrial ablation procedures. He has used the ThermaChoice and NovaSure endometrial ablation medical devices but not Boston Scientific's HTA device, though he has watched the HTA procedure being performed. The ThermaChoice endometrial ablation device works the same way as the Boston Scientific's HTA device except that the heated liquid is contained in a balloon inside the uterus.

Dr. Colton testified in his deposition consistent with his expert witness disclosure. His opinions were based, in part, on Dr. Lentell's deposition testimony that Lundeen's uterus spontaneously ruptured. He opined that such a spontaneous rupture was caused by defendants' collective failure to properly set up, configure, and operate the HTA. He also opined that because neither Dr. Lentell nor Mid America's nurses checked the height of the saline bag, the bag was hung too high, thereby causing excessive gravitational pressure of saline on the uterus. He also opined that if Lundeen's uterus did not spontaneously rupture, then Dr. Lentell breached the standard of care by allowing the hysteroscope and/or the dilator used during the procedure to puncture the uterine wall. Finally, he opined that Dr. Lentell breached the standard of care by improperly reacting to the perforation by introducing more saline through the HTA into the uterus, which caused the heated liquid to exit through the perforation of the uterus into the abdominal cavity, resulting in additional burns to Lundeen's intestines.

Before the pretrial conference, Dr. Lentell moved to exclude Dr. Colton's testimony on the basis that he did not possess the expert qualifications required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2756, 125 L. Ed. 2d 469 (1993), because he had never performed an HTA procedure. The district court denied the motion, ruling that Dr. Colton had the knowledge, skill, experience, training, and education to render an opinion to qualify as an expert under the facts of the case.

*Jury trial*

At trial, Lundeen proceeded against Dr. Lentell on six theories of negligence. Dr. Lentell denied negligence and asserted the comparative fault of Boston Scientific for failing to provide adequate warnings and for failing to provide Dr. Lentell with complete information regarding prior incidents of fluid escaping into the abdomen during the heat and ablation phases.

Dr. Lentell was called as a witness in the plaintiff's case. She testified that when the safety feature shut the HTA machine off, she restarted the machine after 2 seconds. When it shut off a second time, she restarted the machine with cool water. She denied losing 1,000 cc of heated fluid into Lundeen's abdomen even though her post-operative report indicated that up to 1000 cc of HTA fluid was unaccounted for after the procedure. She testified that only about 50 cc of the HTA's fluid escaped into Lundeen's abdominal cavity. She admitted that she referred to the injury in her reports as a perforation of the uterus, rather than a rupture of the uterus. She admitted that the perforation was located in the same spot in the uterus where the hysteroscope had been used. She testified that she stopped using the HTA procedure after Lundeen's injury, but she claimed she did not blame the machine or Boston Scientific for causing the injury, although she noted that Boston Scientific withheld information about other cases where the uterus was perforated during the HTA procedure.

Lundeen called Dr. Colton to testify. He recounted his training and experience as described earlier and the records he reviewed in arriving at his opinions. These included Lundeen's medical records, Dr. Lentell's deposition testimony, the Manufacturer and User Facility Device Experience Adverse Event reported on May 31, 2012, Genesys HTA ProCerva package inserts from 2010 and 2013, and numerous medical articles regarding endometrial ablations and HTA procedures. The articles and materials collectively

8

discuss endometrial ablation procedures with all five of the FDA-approved endometrial ablation devices. The materials addressed uterine perforations and covered the standard of care required in performing endometrial ablations and the treatment and care of a patient whose uterus has been perforated during an endometrial ablation procedure.

Dr. Colton's opinions varied from those expressed in his expert designation and at his deposition. At his deposition, Dr. Colton testified that he believed Dr. Lentell perforated the uterus prior to the start of the HTA procedure when she performed the D&C. This opinion was based in part on the amount of liquid—up to 1,000 cc—that Dr. Lentell had indicated in her post-operative report had spilled into Lundeen's abdomen. The large amount of liquid led Dr. Colton originally to conclude that it had spilled into the abdominal cavity during the 9-minute procedure, indicating that the HTA machine's alarm did not properly function.

When Dr. Lentell changed her estimate of the amount of heated saline spilled into the abdomen from 1,000 cc to 50 cc, Dr. Colton changed his opinion and concluded that if Dr. Lentell's trial testimony was accurate, then the uterus probably was perforated with the hysteroscope 9 minutes into the endometrial ablation procedure, and the HTA machine worked properly in sounding a warning and automatically shutting off. Then, according to Dr. Colton, Dr. Lentell incorrectly responded by attempting to turn the machine back on and by cycling additional liquid into the uterus even after she knew the perforation occurred. Although Dr. Colton changed his opinion as to the timing of the perforation, he consistently testified at his deposition and at trial that Dr. Lentell perforated Lundeen's uterus with a tool, allowing heated liquid to spill into her abdomen.

Dr. Lentell's expert witnesses, Dr. Michael Brown and Dr. Mark Akin, both gynecologists, also testified that the perforation occurred 9 minutes into the procedure. Dr. Akin agreed it was a possibility that the perforation may have occurred early and the

9

uterus "blew out" 9 minutes into the procedure. Dr. Lentell testified about a discussion in the operating room about the uterus being perforated at the start of the procedure. Dr. Lentell's experts also testified that the HTA machine's alarm worked properly.

Defense counsel objected to Dr. Colton's trial testimony that was not consistent with his expert disclosure and his deposition testimony. The district court overruled the objection:

> "I am going to allow the plaintiff to present their evidence. The court does note that this does appear to be a slight change and probably in the defendant's point of view a major change. I will give you free reign on cross-examination. Then if there needs to be a limiting instruction at the appropriate time, I will do so."

At the close of Lundeen's evidence, Dr. Lentell moved for a directed verdict based on her claim that Lundeen had not met her burden of proof. She also renewed her *Daubert* challenge to Dr. Colton's testimony. The court denied both motions.

During the jury instructions conference, defense counsel objected to Jury Instruction No. 4, the contentions instruction. Defense counsel objected to Lundeen's claim that Dr. Lentell failed "to use sufficient care in utilizing instruments such that she perforated plaintiff's uterine wall." Defense counsel argued that the claim was so broad, vague, and ambiguous that it gave the jury a roving commission. Defense counsel also argued that the instruction did not posit a causal connection between turning the HTA machine back on for 2 seconds and damages. These objections were overruled.

The court also instructed the jury, consistent with PIK Civ. 4th 106.01 and without objection, that the jurors did not have to agree on one specific theory of negligence. The

10

instructions did not include any directive that the same 10 jurors must agree on each part of the verdict.

During closing arguments, plaintiff's counsel explained that it was sufficient for only two jurors to agree on one theory of liability, while two others agreed on another, as long as there were 10 votes for liability. He asked the jury to award Lundeen 5/9 of $49,000 because she missed 5 of the 9 months of the school year. (In answering interrogatories, Lundeen had stated she was claiming $22,825.97 in lost wages.)

The jury found that Dr. Lentell was 60% at fault and Boston Scientific was 40% at fault. The jury awarded damages of $85,514.33 for medical expenses, $35,000 for economic loss, and $2,000,000 for noneconomic loss. The court reduced the verdict to $322,308.59 after applying the comparative fault of the parties and the statutory cap of $250,000 for noneconomic damages.

Dr. Lentell's motion for a new trial was not successful, and this appeal followed.

*Permitting Dr. Colton to Testify Contrary to his Expert Disclosure and his Deposition Testimony*

Dr. Lentell contends that the district court erred in failing to grant a new trial for unfair surprise under KS.A. 2014 Supp. 60-259(a) based on Dr. Colton having significantly changed his opinion at trial without first supplementing his expert opinion under K.S.A. 2014 Supp. 60-226(b)(6). At his deposition, Dr. Colton testified that the perforation in Lundeen's uterus likely occurred early in the procedure. But at trial, he testified that he believed the perforation occurred at the 9-minute mark. Dr. Lentell claims this amounted to trial by ambush. See *McGinnes v. Wesley Medical Center*, 43 Kan. App. 2d 227, 235, 224 P.3d 581 (2010) (review was granted but the appeal was later

dismissed by stipulation of the parties). Dr. Lentell claims this change in Dr. Colton's testimony completely changed his "standard of care criticisms."

Generally, the decision to grant a motion for a new trial is within the trial court's sound discretion. *Exploration Place, Inc. v. Midwest Drywall Co.*, 277 Kan. 898, 900, 89 P.3d 536 (2004). Likewise, the admission of expert testimony generally lies within the trial court's discretion. K.S.A. 2016 Supp. 60-456; *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 70, 274 P.3d 609 (2012). The trial court abuses its discretion if: (1) no reasonable person would take the view adopted by the trial court; (2) the trial court's ruling is based on an error of law; or (3) the trial court's ruling is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Under K.S.A. 2016 Supp. 60-456(b), expert witnesses may testify at trial:

"If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is in the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

K.S.A. 2014 Supp. 60-226(b)(6)(B) and (C) require the parties to disclose an expert's opinions and a summary of the grounds for the opinions at least 90 days before trial unless otherwise ordered by the trial court. The statute also requires a party to supplement its disclosure upon learning that the original disclosure is incomplete or incorrect. See *Walder v. Board of Jackson County Comm'rs*, 44 Kan. App. 2d 284, 287, 236 P.3d 525 (2010), *rev. denied* 292 Kan. 969 (2011). The supplementation should be made at least 30 days before trial unless otherwise ordered. K.S.A. 2014 Supp. 60-

226(e)(1). If a party fails to comply with these requirements, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing or at trial, unless the failure was substantially justified or is harmless." K.S.A. 2014 Supp. 60-237(c)

Here, Lundeen made a timely disclosure of Dr. Colton's opinions. She argues that Dr. Lentell's change in her testimony during the trial caused Dr. Colton to change his testimony. In her post-operative report, Dr. Lentell described that up to 1,000 cc of fluid was unaccounted for. At trial, she testified that she believed the fluid loss to be about 50 cc, only about 5% of what she originally claimed.

Dr. Colton also opined at trial that the HTA machine worked properly in sounding a warning and automatically shutting off. Two of Dr. Lentell's experts also testified that the HTA machine's alarm worked properly. Lundeen asserts that Dr. Lentell's change in her testimony also caused one of Dr. Lentell's experts to change his testimony. Louis F. Draganich, Ph.D., a mechanical engineer, was designated to testify at trial "that the HTA malfunctioned as a result of a defect rather than user error." At trial, instead of testifying the HTA malfunctioned, he testified that the HTA's alarm worked fine and the HTA did not malfunction.

At trial, Dr. Colton testified that he believed Dr. Lentell had perforated the uterus with the hysteroscope 9 minutes into the procedure. But regardless of whether the perforation occurred early or late in the procedure, he opined that Dr. Lentell caused the perforation that allowed heated liquid to spill into Lundeen's abdomen and improperly turned the machine back on and introduced additional liquid into the uterus after she knew the perforation occurred.

The district court gave Dr. Lentell's counsel "free reign" to cross-examine Dr. Colton and to point out any inconsistencies in Dr. Colton's testimony and offered to give

13

a limiting instruction if needed. Defense counsel spent a significant amount of time cross-examining Dr. Colton and specifically pointed out to the jury that his opinions at trial differed from his deposition testimony. In his closing argument, defense counsel argued extensively about the alleged differences in Dr. Colton's deposition and his trial testimony. Defense counsel referred to Dr. Colton's testimony as "wrong" and asserted he was "just not credible."

An expert's opinion must be based on facts which enable the expert to express a reasonably accurate conclusion. "[E]vidence of probative value should not be excluded from the jury's consideration merely because a medical expert cannot state a fact with absolute certainty." *Nunez v. Wilson*, 211 Kan. 443, 446, 507 P.2d 329 (1973). Here, Lundeen disclosed in both the expert designation and in Dr. Colton's deposition that Dr. Colton believed that Dr. Lentell perforated the uterus with a tool. His opinion as to when the puncture occurred changed in response to Dr. Lentell's trial testimony regarding the amount of fluid loss. Lundeen's substantive theory did not change: Dr. Lentell was negligent in perforating the uterus. We are not convinced that Dr. Colton's change in the timing of the perforation so prejudiced Dr. Lentell as to require a new trial.

In *Foster v. Klaumann*, 42 Kan. App. 2d 634, 216 P.3d 671 (2009), *rev'd on other grounds* 296 Kan. 295, 294 P.3d 223 (2013), the plaintiffs in a medical malpractice case argued that an expert was allowed to express opinions at trial not disclosed in accordance with K.S.A. 60-226(b). The plaintiffs complained that the expert physician was allowed to classify the nerve injury as a "fourth-degree and sixth-degree injury" and that the pretrial disclosures "did not mention a specific nerve, nerve branch, or the motor and sensory functions they supply." 42 Kan. App. 2d at 679. A panel of this court found that the expert's trial testimony was consistent with her pretrial disclosures. The expert's opinions in the disclosure and in her testimony at trial related to the injury to the victim's deep peroneal nerve, the central issue at trial. Further, the court stated that "expert

14

disclosures are not meant to disclose every detail of testimony that an expert is expected to give." 42 Kan. App. 2d at 680. The court concluded that the expert's trial testimony was consistent with her pretrial disclosures.

Here, we conclude the trial court did not abuse its discretion by allowing Dr. Colton to testify about the timing of the uterine perforation in response to Dr. Lentell's trial testimony. Lundeen did not have sufficient time under K.S.A. 2014 Supp. 60-226(e)(1) to supplement her expert's pretrial disclosure. The changing of Dr. Lentell's testimony at trial provided substantial justification under K.S.A. 2014 Supp. 60-237(c) for Dr. Colton to change the opinions he previously expressed. Besides, Dr. Colton was subjected to rigorous cross-examination. Defense counsel pointed out the inconsistencies in Dr. Colton's testimony to the jury. Defense counsel argued at length about how Dr. Colton's change in testimony rendered his opinion unreliable and unbelievable. The jury was able to evaluate the weight and credibility of Dr. Colton's opinions.

Dr. Lentell asserts that Dr. Colton's change in testimony affected and undermined her comparative fault trial strategy. She asserts that Dr. Colton's original theory, that she had perforated the uterus before the HTA procedure, placed more of the blame on Boston Scientific. Thus, she would have stressed the fact that the HTA machine failed to signal an alarm until the procedure was nearly over. But in her trial testimony prior to Dr. Colton's testimony, Dr. Lentell testified that she did not place blame on Boston Scientific with the exception of her claim that Boston Scientific withheld information about other cases in which the uterus was perforated during the HTA procedure.

Contrary to Dr. Lentell's argument, it seems unreasonable to us, under circumstances such as we find here, to require an expert to express opinions at trial which are no longer supported by the facts as developed during the trial. Further, there is no indication that Dr. Lentell was unable to adjust her trial strategy based on the change in

15

Dr. Colton's testimony. She does not assert that she would have called an additional witness or that she was unable to fully cross-examine Dr. Colton regarding the change in his opinion as to the timing of the perforation. The jury found Boston Scientific to be 40 percent at fault, indicating that Dr. Lentell was successful in convincing the jury that Boston Scientific was partially to blame.

Dr. Colton testified that it was not easy to figure out what had happened in this case because Dr. Lentell provided "different documentation at different times." In her post-operative report, she reported up to 1,000 cc of fluid lost. At her deposition she testified that a large amount of fluid was lost. At trial, she testified that the amount was about 50 cc. But Dr. Colton's opinion that the standard of care was breached was based on his theory that Dr. Lentell made the situation worse by failing to immediately perform a laparoscopy and by flushing cool liquid into the uterus and thereby forcing the heated liquid through the perforation. According to Dr. Colton, the timing of the perforation was not key to his opinion:

"Q. So in regard to exactly the moment of the perforation, does that make any difference to your opinion one way or the other?
"A. No, the fact is a perforation occurred."

He pointed out that Dr. Lentell's "unorthodox actions" taken after the perforation indicated that she was not prepared for the complication.

We conclude that the trial court did not abuse its discretion by allowing Dr. Colton to change his opinion regarding the timing of the perforation and by denying Dr. Lentell's motion for a new trial on this basis.

16

*Denying Motion for Judgment as a Matter of Law Based on Plaintiff's failure to meet the* Daubert *Standard.*

Dr. Lentell asserts that the trial court erred in failing to enter judgment as a matter of law in her favor based upon Dr. Colton not satisfying the expert witness standard found in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). She argues that Dr. Colton was neither qualified to offer an expert opinion nor did his testimony meet the reliability principles of *Daubert*. She challenged Dr. Colton's qualification as an expert both prior to trial in a motion to strike him as an expert because he had never performed an HTA procedure. Then, after the verdict, she moved for judgment as a matter of law on the basis that Dr. Colton was not qualified under K.S.A. 2014 Supp. 60-456 and the *Daubert* standard. The trial court denied Dr. Lentell's motions.

On this issue, we decide de novo whether the evidence was sufficient to avoid the trial court striking Dr. Colton as an expert witness or later entering a judgment as a matter of law against Lundeen. See *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). We also review de novo whether the court properly applied the proper standard in admitting Dr. Colton's testimony. If the proper standard was used by the trial court, we apply the abuse of discretion in the trial court's decision to admit Dr. Colton's testimony. See *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 493-94, 369 P.3d 966 (2016).

The 2014 legislature amended K.S.A. 60-456 through K.S.A. 60-458 so as to abandon our reliance on the *Frye* test for scientific evidence (from *Frye v. United States*, 293 F. 1013 [D.C. Cir. 1923]) and to adopt the federal standard under Fed. R. Evid. 702 based on the principles of *Daubert*.

17

K.S.A. 2014 Supp. 60-456(b) governs the admission of expert testimony. It provides:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

Under *Daubert*, the court determines the reliability of proposed scientific testimony by looking to factors such as: (1) whether the theory has been tested; (2) whether it has been subject to peer review and publication; (3) its known or potential rate of error; and (4) whether it has attained widespread or general acceptance. 509 U.S. at 592-94. These four factors are not a definitive checklist or test, and in some cases the relevant reliability concerns focus on the specific facts of a particular case, such as personal knowledge or experience. *Smart*, 52 Kan. App. 2d at 495 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 [1999]).

K.S.A. 2014 Supp. 60-456 requires the district court to make two fundamental decisions: (1) whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion; and (2) whether the proposed expert testimony is reliable and relevant so that it will assist the trier of fact. *Smart*, 52 Kan. App. 2d 486, Syl. ¶ 7. See *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

On the reliability issue, the analysis may focus on personal knowledge or experience rather than the *Daubert* factors and scientific foundation. *Kumho Tire*, 526 U.S. at 150. In *Kumho Tire*, the United States Supreme Court expanded the *Daubert* inquiry to cover expert testimony that is not purely scientific. To the extent that an expert

18

witness is relying primarily on experience rather than on scientific methodology, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts of the case. *Smart*, 52 Kan. App. 2d 487, Syl. ¶ 9; see *United States v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004.)

Although the proponent of expert testimony bears the burden of showing that it is admissible, the exclusion of expert testimony is the exception rather than the rule. *Smart*, 52 Kan. App. 2d at 496.

Dr. Lentell asserts that Dr. Colton did not possess the requisite knowledge, skill, experience, training, or education to give an expert opinion on an HTA procedure. But Dr. Colton was not required to have performed the specific HTA procedure performed by Dr. Lentell to qualify as an expert. Dr. Colton is board certified in obstetrics and gynecology. He specializes in laparoscopic, hysteroscopic, and vaginal reconstructive surgery, as well as office-based gynecological surgery. He has performed approximately 2,700 diagnostic and operative hysteroscopies and approximately 1,000 endometrial ablation procedures. He has used the ThermaChoice and NovaSure endometrial ablation medical devices. He has watched an HTA procedure being performed, and he researched the history of HTA "from inception of the device to its current use" because he teaches residents and wants to "be as knowledgeable as possible."

Prior to rendering any opinions, Dr. Colton reviewed Lundeen's medical records, Dr. Lentell's deposition, the Manufacturer and User Facility Device Experience Adverse Event reported on May 31, 2012, Genesys HTA ProCerva package inserts from 2010 and 2013, and numerous medical articles regarding endometrial ablations and HTA procedures. The articles and materials collectively discuss endometrial ablation procedures with all five of the FDA-approved endometrial ablation devices. The

materials addressed uterine perforations and further dealt with the standard of care required in performing endometrial ablations and the treatment and care of a patient whose uterus has been perforated during an endometrial ablation procedure.

Although Dr. Colton had not performed the specific HTA procedure in this case, there is little doubt that he had the education, training, experience, and knowledge required for an expert in endometrial ablations. Accordingly, the trial correctly ruled that Dr. Colton was qualified as an expert.

The trial court also correctly addressed the reliability issue. The law grants a trial court broad latitude when it decides how to determine reliability. "The purpose of the reliability determination is not to decide whether the expert's conclusions are correct but whether the analysis used to reach them is reliable." *Smart*, 52 Kan. App. 2d at 495-96. It is the trial court's duty to ensure that the expert, whether basing opinions on professional studies or personal experiences, employs in the courtroom the same intellectual rigor that characterizes the practice of an expert in a relevant field. *Kumho Tire*, 526 U.S. at 152.

Dr. Lentell relies on *Ralston*, 275 F.3d at 970, in which the court held that the possession of a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue. A medical expert cannot rely on broad principles in a medical field to give specific opinions on a specialized subset of that field. Thus, the trial court did not err in excluding the testimony of a board-certified orthopedic surgeon regarding a specific orthopedic surgical technique called intramedullary nailing with which the witness had no experience, knew little to nothing about the device, and had conducted no research on the device.

Dr. Lentell also relies on cases from other jurisdictions holding that an expert must possess specialized knowledge in order to provide expert testimony. See *Huskey v.*

*Ethicon, Inc.*, 29 F. Supp. 3d 691, 711-12 (S.D. W. Va. 2014) (biomedical engineer was not qualified to testify in patient's action against surgical mesh manufacturer where engineer did not possess any relevant work or educational experience); *Cleveland ex rel. Cleveland v. United States*, 457 F.3d 397, 405 (5th Cir. 2006) (internist was not qualified to testify as expert on the standard of care for diagnosing congestive heart failure where internist had not worked in an emergency room and there was no indication that the emergency room standard of care for diagnosing the condition was identical to the standard of care in internal medicine); *Butler v. First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009) (attorney who specialized in personal injury was not qualified to offer expert testimony as to the standard of care for insurance claims adjuster).

But in *Ralston* and these other cited cases, the experts did not possess any relevant work or educational experience to support their opinions.

Much of Dr. Lentell's argument on this issue consists of attacks on the specific testimony given by Dr. Colton rather than showing how the trial court erred in applying the *Daubert* principles in this case. Lundeen does not need to prove that Dr. Colton was indisputably correct or even that his theory is "generally accepted" by his scientific community. She merely needed to show that Dr. Colton's method used in reaching his opinions was scientifically sound and that his opinions were based on the facts of the case. See *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781-82 (10th Cir. 1999). Even though *Daubert* requires the trial court to act as a gatekeeper to expert testimony, it is not meant to replace "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" as the traditional means of attacking evidence. 509 U.S. at 596.

21

Dr. Colton had extensive knowledge and expertise regarding endometrial ablations. Though he had not performed the specific HTA procedure used in this case, he had performed similar procedures, and he had observed an HTA procedure being performed. He reviewed Lundeen's medical records, Dr. Lentell's deposition and trial testimony, and he reviewed several articles and inserts regarding the HTA procedure. He properly applied the facts of the case in reaching his opinions. The trial court properly denied Dr. Lentell's motion for judgment as a matter of law based on the argument that Dr. Colton's testimony should have been excluded, and without it Lundeen failed to present a submissable case.

*Error in Instructing the Jury on Plaintiff's Claims*

Dr. Lentell contends the trial court erred in listing Lundeen's contentions instructing two of her theories of negligence: the contentions found in paragraphs A and F of Jury Instruction No. 4:

> "The plaintiff claims she was injured due to the defendant's fault in the following respects:
>
> "A. Failing to use sufficient care in utilizing instruments such that she perforated plaintiff's uterine wall; or
>
> . . . .
>
> "F. Failing to stop the procedure after suspecting plaintiff's uterus had been perforated."

The trial court was required to give an instruction supporting Lundeen's negligence theories if there was evidence supporting the theories which, if accepted as true when viewed in the light favoring Lundeen, was sufficient for a reasonable juror to return a favorable verdict based on such evidence. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010).

22

Dr. Lentell appears to argue that the evidence was insufficient to show that her actions were the proximate cause of Lundeen's injuries, especially in reference to the claim that Dr. Lentell caused her injuries by failing to stop the procedure when she suspected that Lundeen's uterus had been perforated.

The record contains sufficient evidence to support a jury verdict that Dr. Lentell failed to use sufficient care in using the instruments, resulting in a perforation of Lundeen's uterine wall. Dr. Colton testified that he believed that Dr. Lentell perforated Lundeen's uterus with a tool and that such a perforation was below the standard of care. The specific tool was not important because all of the tools were under Dr. Lentell's control.

Dr. Lentell testified that the most common cause of uterine perforation is by a physician using a tool. Dr. Akin testified that Lundeen's uterus may have been perforated early in the procedure when Dr. Lentell was using the dilator, uterine sound, curette, and hysteroscope. Dr. Lentell testified that there was a discussion in the operating room during one of Lundeen's subsequent surgeries about whether she perforated Lundeen's uterus with the uterine sound. Dr. Lentell's biomechanical engineer had also reviewed materials in forming his opinions that suggested that Lundeen's uterus may have been perforated with the uterine sound.

Dr. Lentell complains that the jury instruction was overly broad as many instruments were used during the procedure. However, she does not explain what the relevance would be of the specific instrument used in invalidating the jury's verdict. The evidence at trial indicated that it was likely that the uterine wall was perforated with one of the instruments and that such a perforation was below the standard of care. There was sufficient evidence presented at trial to support this theory of negligence.

23

The record also contains evidence that Dr. Lentell breached the standard of care by failing to stop the procedure after suspecting that Lundeen's uterus had been perforated. Dr. Colton testified that if Dr. Lentell had merely stopped the HTA procedure when the alarm sounded, there would have been less damage to Lundeen's internal organs, but Dr. Lentell ignored Boston Scientific's warnings about turning the device back on before inspecting the uterus for a perforation. This opinion was corroborated by the information provided by Boston Scientific in its brochure on the use of the HTA machine. Dr. Lentell inspected the uterus with the hysteroscope for a perforation after she temporarily restarted the machine. She testified that "in retrospect it is easy to know" that she should not have turned the machine back on after the alarm sounded.

In addition, Dr. Colton testified that adding more saline through the HTA after Dr. Lentell knew that she had perforated her uterus caused further injury to Lundeen's bowel. Dr. Lentell asserts that Dr. Colton admitted that Dr. Lentell's action of turning the HTA machine back on did not cause further damage to Lundeen. But Dr. Colton explained that pushing the cool fluid through the HTA machine, rather than just waiting for the fluid to cool, may have resulted in greater injury. There was evidence presented at trial supporting Lundeen's theory that Dr. Lentell was negligent in failing to stop the procedure after suspecting that Lundeen's uterus had been perforated.

*Error in Instructing the Jury on the Number of Jurors Needed to Reach a Verdict on a Theory of Negligence*

Dr. Lentell argues that the trial court committed clear error by instructing the jury that it was not required to reach a majority on one singular theory of negligence. She cites the clear error standard because there was no objection to the instruction at trial. See K.S.A. 2014 Supp. 60-251(d)(2); *State v. Cameron*, 300 Kan. 384, 388, 329 P.3d 1158, *cert. denied* 135 S. Ct. 728 (2014).

24

In our review of this claim we have unlimited review in determining whether the instruction was legally appropriate. Whether the instruction is factually appropriate is measured by whether there is substantial evidence supporting it which, viewed in the light favoring Lundeen, could legally support a verdict in her favor on the issue. If we find the instruction was given in error, we then must decide whether the error was harmless. See K.S.A. 2016 Supp. 22-3414(3); *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

Under the clear error for establishing prejudice, we must be firmly convinced that giving the challenged instruction would have resulted in a more favorable outcome for Dr. Lentell. See *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016); *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014); *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

In the court's instruction on Lundeen's various contentions of negligence, the court instructed the jury: "The plaintiff has the burden to prove that one or more of her claims are more probably true than not true. It is not necessary that each of you agree upon a specific claim." In closing arguments, Lundeen's counsel stated that it was sufficient for only two jurors to agree on one theory of liability, while two others agreed on another, and so on, until they achieved at least 10 votes.

The challenged jury instruction followed PIK Civ. 4th 106.01. PIK Civ. 4th 106.01 sets forth the form instruction to be used in informing the jury of the parties' admissions, denials, claims, and defenses. The instruction also sets forth the burden of proof on the various claims. Although the use of PIK instructions is not required, it is strongly recommended, as these "'"instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions."' [Citation omitted.]" *State v. Acevedo*, 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013), *rev. denied*

25

300 Kan. 1104 (2014); see *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). Absent the need to modify an instruction based on particular facts, PIK instructions and recommendations should be followed. *State v. Appleby*, 289 Kan. 1017, Syl. ¶ 20, 221 P.3d 525 (2009).

PIK Civ. 4th 106.01 clearly provides that it is not necessary for the jury members to agree as to which specific negligent act or omission led to the plaintiff's injuries. See *Cox v. Lesko*, 263 Kan. 805, 820, 953 P.2d 1033 (1998). This jury instruction is consistent with Kansas law as provided by our Supreme Court in *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985).

Dr. Lentell complains that because she alleged the comparative fault of Boston Scientific, a nonparty at trial because of its prior settlement with Lundeen, it was possible that 10 jurors believed one or more of the theories of negligence against Boston Scientific and none of the jurors believed even one of the six theories of negligence against Dr. Lentell. Such was not the case here. This argument ignores the fact that the jury compared the fault of Boston Scientific and Dr. Lentell and found Dr. Lentell was 60 percent at fault.

Dr. Lentell relies on *Barker v. Railway Co.*, 89 Kan. 573, 576-77, 132 P. 156 (1913), in which the plaintiff asserted that his orchard was destroyed by a fire set by the defendant in the operation of its railroad. The railroad requested that the court require the jury to determine whether the fire was caused by defective equipment or improper operation. In *Barker*, our Supreme Court stated:

> "We can not agree with the contention of plaintiff's counsel that if half of the
> jurors believed the fire was caused by a defect in the engine and the other half that it was
> caused by improper operation, the plaintiff would still be entitled to recover. If this were

26

true there might be a consensus of opinion as to the liability of the defendant on 12 different bases on which such opinion could rest, each relied on by only 1 of the jurors and none by all. Their unanimous opinion as to the essential facts of the case, as well as to the general result, must be in favor of the prevailing party." 89 Kan. at 576-77.

But our Supreme Court specifically disagreed with the reasoning of the *Barker* court in *Cleveland*. Dr. Lentell tries to distinguish *Cleveland* based on the claim that "the rationale applied by the *Cleveland* court simply does not apply when Plaintiff submits six different theories of negligence." Dr. Lentell needed to read *Cleveland* more closely. The jury in *Cleveland* was instructed on six different negligence claims, the same number of claims Lundeen submitted in the present case. On appeal, the defendant argued that the jury instructions permitted the jurors to agree that the defendant was negligent without agreeing upon a specific act of negligence and that it permitted each of 10 jurors to decide negligence based on a different claimed act of negligence. Our Supreme Court reasoned:

"In a surgical malpractice case, if half of the jurors believe that the surgeon left a sponge in the incision and the other half believe that he left gauze rather than a sponge in the patient, and assuming that the evidence would support either finding and that the surgeon's omission caused the damage, should recovery be denied? We think not. If a jury finds a defendant negligent *in one or more* of the claims of negligence upon which there is competent substantial evidence, and further finds that the plaintiff sustained damages as a direct result of the defendant's negligence, that is sufficient." *Cleveland*, 237 Kan. at 418.

The *Cleveland* court specifically held that "[u]nanimity upon the specific negligent act or omission is not required." 237 Kan. at 418. We find no error, let alone clear error, in giving this instruction.

27

*Error in Instructing the Jury that the Same 10 Jurors were Not Required to Agree on Each Part of the Verdict*

In a related claim of an instructional error, Dr. Lentell complains that the jury instructions did not require the same 10 jurors to agree on each part of the verdict. K.S.A. 2016 Supp. 60-248(g) provides: "When the jury consists of 12 members, the agreement of 10 jurors shall be sufficient to render a verdict. In all other cases, subject to the stipulation of the parties as provided in subsection (a), the verdict must be by agreement of all the jurors."

Dr. Lentell's argument is based on the logically fallacious notion expressed in her appellate brief:

> "Ultimately, Boston Scientific was found to be 40% at fault. While the specific breakdown is unknown, it is logical to conclude that only 60% of the jurors believed Plaintiff's injury was caused by something Dr. Lentell did. Sixty percent of a 12-person panel is 7 jurors which would have been less than required for a verdict."

It is not logical to so conclude. She does not know if the verdict was agreed upon by 10, 11, or 12 jurors. Even if we assume a 12-person verdict as Dr. Lentell does, that results, under her theory, in 7.2 jurors finding fault against her. Who is that 2/10th juror who believed Dr. Lentell was at fault? More importantly, Dr. Lentell ignores the whole notion that comparative fault distributes the fault among those whose negligence caused *or contributed to* the plaintiff's injuries and damages. Comparative fault does not count noses to see how many jurors found one party to be 100% at fault. If Dr. Lentell's theory held any water, how would she explain the verdict of 10 jurors assessing the comparative fault of two parties on a 51%-49% basis?

28

Dr. Lentell cites *Hendrix v. Docusort, Inc.*, 18 Kan. App. 2d 806, 860 P.2d 62 (1993), in which a panel of this court addressed a similar complaint. The defendant complained that the trial court erred by accepting 10 to 2 verdicts on three questions, even though the same 10 jurors did not necessarily comprise the majority on each question. The jury was polled, and nine jurors responded that it was their verdict. But three responded negatively. The trial court asked the jurors to return to the jury room to clear up the confusion. After doing so, the jury sent a note to the judge indicating that 10 jurors had agreed to the apportionment of fault question, and 10 agreed on the amount of damages to be awarded. However, the majorities were not comprised of the same people. The court accepted the verdict and entered judgment for the plaintiff.

On appeal, the panel in *Hendrix* discussed the "same juror" and "any majority" rules. 18 Kan. App. 2d at 809-12. The same juror rule requires that the same 10 jurors agree to each part of the verdict. The "any majority" rules requires only that 10 jurors agree that there was a departure from the standard of care while 10 other jurors agree on causation. 18 Kan. App. 2d at 809-10.

The *Hendrix* court, noting the holding in *Cleveland*, adopted the "any majority" rule, finding that it achieved the policy behind statutes which allow less than unanimous verdicts, including overcoming hung juries which lead to mistrials and new trials. *Hendrix*, 18 Kan. App. 2d at 812.

While Dr. Lentell points to several jurisdictions which have rejected the "any majority" rule, that is not the law in Kansas so far as we have determined. Besides, applying the clear error standard of review due to Dr. Lentell's failure to raise this issue before the instructions were given to the jury, she does not present any evidence that convinces us that had a different instruction been given, the verdict would have been different.

29

We find no error, let alone clear error, in instructing the jury on this issue.

*Error to Refuse to Amend the Jury Award of Economic Damages*

Dr. Lentell's final argument is based on the lack of sufficient evidence to support a portion of the jury's award. We limit our consideration of this issue to an examination of the record to determine if there is sufficient evidence to support the award.

Dr. Lentell claims that the trial court erred in refusing to amend the jury's award of $35,000 for Lundeen's economic loss due to the insufficiency of the evidence to support it. Lundeen testified at trial that her 9-month teacher's salary was $49,000 and that she was off work for 5 months of the school year. In closing, Lundeen's counsel asked the jury to return a verdict that included 5/9 of $49,000, or $27,222.22, for her lost wages. The jury's verdict included $35,000 for her economic loss, more than Lundeen had requested for lost wages.

We review the trial court's refusal to amend the judgment for any abuse of discretion. *Apodaca v. Willmore*, 51 Kan. App. 2d 534, 546, 349 P.3d 481 (2015), *rev. granted* 303 Kan. 1072 (2016). As to whether there was substantial evidence to support the award, we examine the record in the light favoring Lundeen to determine if a rational juror could have come up with a $35,000 award. See *Shirley v. Smith*, 261 Kan. 685, 694, 933 P.2d 651 (1997); *Kendrick v. Manda*, 38 Kan. App. 2d 864, 871, 174 P.3d 432 (2008).

Here, the jury was provided with Jury Instruction No. 10, modeled after PIK Civ. 4th 171.02, which stated in part: "Economic loss includes loss of time or income and losses other than medical expenses incurred as a result of plaintiff's injuries to date." Dr.

30

Lentell claims that plaintiff's only claims of economic loss other than medical bills were her time and wages lost at work.

Damages need not be proven with absolute certainty. "The inability to calculate damages with absolute exactness does not render them too uncertain to preclude their award." *Cott v. Peppermint Twist Mgmt. Co.*, 253 Kan. 452, Syl. ¶ 5, 856 P.2d 906 (1993). There is no fixed or absolute standard for measuring the adequacy or inadequacies of a verdict in a personal injury action. The question must be decided on the particular facts of the individual case. *Lehar v. Rogers*, 208 Kan. 831, Syl. ¶ 3, 494 P.2d 1124 (1972). The factfinder can estimate damages using a reasonable basis for computation and the best evidence available under the circumstances. But claims for damages that are conjectural and speculative cannot form a sound basis for an award. *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1021, 360 P.3d 447 (2015).

Lundeen presented testimony regarding other economic damages besides her lost wages, such as clothing, time away from work to deal with the colostomy bag accidents, and trips to the Mayo Clinic. She asserts that the "cost of buying new clothing, the time devoted to changing her colostomy bag for 11 months and the time and expense involved in twice traveling to and from the Mayo Clinic by car were within the jury's common knowledge." There is evidence in the record to support her assertion that she incurred these economic damages. We find sufficient evidence to support the jury's award of economic loss. The district court did not abuse its discretion in denying Dr. Lentell's posttrial motion on this issue.

As such, Dr. Lentell has failed to show that the trial court abused its discretion in refusing her request to reduce the award of economic damages.

31

*Cross-appeal: Constitutionality of K.S.A. 60-19a02?*

As the sole issue in her cross-appeal, Lundeen argues that the amount of the $250,000 statutory cap on noneconomic damages is unconstitutional. She claims the district court erred in denying her motion to find it so.

The jury awarded Lundeen $1.2 million in noneconomic damages, but because of the cap in K.S.A. 2014 Supp. 60-19a02, the award was reduced to $250,000. She asserts that her intestines were horribly burned and she had to wear a colostomy bag and undergo three additional surgeries to have them repaired.

Lundeen's constitutional claim was resolved by our Supreme Court 5 years ago upholding the statute in *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 6, 289 P.3d 1098 (2012). We are duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015), *rev. denied* 303 Kan. 1078 (2016). Lundeen's case was tried less than 2 years after our Supreme Court's holding in *Miller*. In deciding this issue, the court in *Miller* observed that the Kansas legislature's failure to increase the statutory cap for 24 years was "troubling." 295 Kan. at 664. But the court concluded:

> "But despite our concern, we cannot say at this time that the legislature's failure to increase the statutory cap has sufficiently diluted the substitute remedy to render the present cap clearly unconstitutional when viewed in light of the other provisions of the Act that directly and exclusively benefit a medical malpractice plaintiff. As we have noted previously, '[e]ach case must be decided on its own merit, for our law does not require a complete balance and equality between the benefits conferred by statute in place of the common-law remedy.' [Citation omitted.]" 295 Kan. at 665.

32

Since the holding in *Miller* the legislature has amended K.S.A. 60-19a02 to gradually increase the cap, but Lundeen's cause of action accrued before the amendments became effective. L. 2014, ch. 84, § 1. Nevertheless, we have no indication that our Supreme Court is departing from its position in *Miller*. We are bound to follow its precedent.

Affirmed.